**Melvin A. McCABE, et al., Plaintiffs,**

v.

**Arvon J. ARAVE, et al., Defendants.**

**Civ. No. 84–1251.**

United States District Court,
D. Idaho.

Jan. 27, 1986.

Melvin A. McCabe, pro se.

Anthony G. Cootz, Lay Representative, Idaho State Correctional Institution, Boise, Idaho, for plaintiffs.

Jim Jones, Atty. Gen., State of Idaho, Robert R. Gates and Timothy R. McNeese, Deputy Attys. Gen., State of Idaho, Boise, Idaho, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CALLISTER, Chief Judge.

This matter came on for trial before the Court on December 16, 1985, at the Idaho State Correctional Institution in Boise, Idaho. The Court has reviewed the testimony and evidence presented at trial and the pleadings and memoranda on file herein. The following are the Court's findings of fact and conclusions of law made pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

1. This is a civil rights action brought under 42 U.S.C. § 1983 by plaintiffs Melvin A. McCabe and Mark Madsen, inmates of the Idaho State Correctional Institution (ISCI).

2. Defendants are Arvon Arave, Warden of the ISCI, and Al Murphy, Director of the Idaho State Department of Corrections (Department).

3. Plaintiffs claim to be members of the Church of Jesus Christ Christian (CJCC) and allege that defendants have violated their first amendment rights of free exercise of religion by denying them permission:

 a. To conduct CJCC worship services in the prison chapel;

 b. To hold CJCC group study classes;

 c. To hold banquets on religious holidays;

 d. To distribute literature of the church;

 e. To confer with CJCC ministers on a personal and group basis;

 f. To grow facial hair;

 g. To have special dietary considerations;

 h. To receive and keep in their possession all books and pamphlets pertaining to the church.[1]

4. Defendants contend that plaintiffs' beliefs are not "religious" and thus do not come within the protection of the first amendment. Further, even if plaintiffs' beliefs are religious, defendants maintain that the restrictions imposed upon the prac-

---

1. Items f, g and h are not alleged specifically in plaintiffs' complaint but were made part of the case at trial.

tice of those beliefs are necessary for prison security and other legitimate penalogical purposes.

5. There are approximately 8–12 inmate members of the CJCC at the ISCI; a somewhat greater number of inmates have demonstrated interest in attending church services or classes, though they are not members of the church.

6. At present, the following religious denominations are allowed entrance into the ISCI to conduct religious services and study classes:

 a. Catholic

 b. Church of Jesus Christ of Latter-day Saints (Mormon)

 .c. Jewish

 d. Islamic

 e. Protestant (includes approximately 20 distinct denominations).

 f. Jehovah's Witnesses

 g. Native American

Religious groups which are allowed entry hold their worship services in the prison chapel; study classes are also held in the study rooms adjacent to the chapel.

8. Medium custody inmates are allowed free access to any religious worship services and study classes held in the chapel facility; close custody inmates are not allowed to attend worship services and study classes held in the chapel facility. There are some intra-denominational services and classes held in the close custody housing units, these services and classes being provided by Mormon, Catholic and some Protestant denominations. These services are not held on a regular basis each Sunday as are those held in the prison chapel. Both plaintiffs are presently in close custody.

9. Plaintiffs have sought permission for the CJCC to be allowed to conduct worship services and study classes at the ISCI. Presumably, plaintiffs desire that these services and classes be held both in the prison chapel and in the close custody units.

10. The ISCI administration denied plaintiffs' request. This denial was based on prison officials' conclusion that CJCC doctrines do not amount to religious beliefs, that the CJCC is not a religion, and that admission of the church into the ISCI would create serious security problems and promote violence. This conclusion was based on the administration's investigation of CJCC beliefs, their knowledge of corrections problems nationwide, and on incidents at the ISCI, discussed below.

11. The ISCI administration based its decision, in part,[2] upon the recommendation of the Community Religious Advisory Council, a volunteer organization composed of various religious leaders in the Boise area. The Council was originally formed to advise the ISCI administration on religious matters affecting the facility. Don Stephan, prison chaplain of the ISCI, is the chairman of the Council. The Council's recommendation to the ISCI administration was embodied in a position paper authored by Stephan. Exhibit 9. The Advisory Council reviewed CJCC literature which had been provided to Chaplain Stephan by plaintiff McCabe in the form of Aryan Nations publications. Based on this literature, which was the only information provided by plaintiffs at Stephan's request, the Council took the position that the CJCC and an organization known as the Aryan Nations are essentially one and the same. Because of the racist and violent attitudes espoused by these groups, the Council recommended that the CJCC not be admitted to the ISCI.

12. Director Al Murphy, as head of the Department of Corrections, determines Department policy regarding personal property. The Department has determined that inmates can have no more than six cubic feet of space for personal property, excluding televisions, guitars, radios and fans. Exhibit 1. There are no exceptions to this

---

**2.** The decision was also based on information obtained by Director Al Murphy in a visit to the Hayden Lake compound in May 1983.

policy. Its purpose is to allow ease and rapidity of cell searches, which are conducted frequently and regularly throughout the ISCI. These frequent searches are made necessary by the Prison's major problem, contraband, and the need for rapidity in daily cell searches. Inmate-constructed weapons are also a problem which necessitates the above measures. Officers are required to examine all pages of books and magazines in cell searches; large numbers of books would greatly prolong the time required to search a cell. As part of the six cubic feet rule, inmates are allowed to have ten books and/or magazines. An exception to the ten-book/magazine rule could be made depending on the inmate and reason for the exception, so long as all personal property does not exceed six cubic feet. Exhibit 1.

13. Plaintiffs have not requested an exception to the ten-book/magazine rule nor filed a grievance with regard thereto.

14. Plaintiffs believe that 20–40 books or booklets are necessary in order for them to properly study and understand CJCC doctrine. These books are not strictly required of church members but are strongly suggested.

15. Plaintiffs presented no evidence regarding restrictions on their distribution of church literature to other inmates, aside from the fact that the church is not permitted entry to conduct study classes and worship services.

16. Religious organizations are not allowed to hold banquets in the ISCI on religious holidays. Plaintiffs presented no evidence that they had made requests to hold banquets, when such banquets would be desired, or why such banquets are a requirement or practice of church membership.

17. CJCC pastors are allowed to visit inmates individually and have done so for the last 3–4 years. Pastors John Miller and Robert Mansger have made several visits to the ISCI, including a number to plaintiff McCabe. At such visits, the pastors could only take a Bible into the visiting room.

18. Religious dietary and grooming practices are generally allowed at the ISCI with certain restrictions, outlined below.

19. Any inmate asserting that his religious beliefs prohibit the cutting of facial or head hair must comply with the following criteria:

a. Within seven days of initial reception at the facility or immediately upon determination that the cutting of hair violates his religious principles, the inmate will inform the facility head in writing:

(1) The name of the religion to which he is an adherent.

(2) That the prohibition of the cutting of head or facial hair is "deeply rooted in the religious beliefs" of those who adhere to that religion.

(3) That he sincerely believes that the cutting of his own facial or head hair would violate his religious beliefs.

(4) That he requests to be excluded from the enforcement of any haircutting regulation of the facility where he is housed.

b. If the above criteria are met, the request for exclusion from enforcement of any haircutting regulation will be granted for a period of ninety days. For an indefinite continuance of the exclusion, the inmate must provide to the facility head, at the end of that ninety-day period, one written statement from a recognized spokesman or authority of the professed religion stating that the prohibition of the cutting of facial or head hair is "deeply rooted in the religious beliefs" of the religion, and one notarized written statement from a person who can verify from personal knowledge that the inmate requesting a continuance of the exclusion is a sincere adherent to that belief.

c. These criteria will be liberally construed to assure that those inmates requesting exclusion from haircutting regulations are requesting exclusion for reasons of sincere, religious convic-

tions, and not from a desire to circumvent institutional rules designed to facilitate the orderly and secure operation of the correctional facility.

d. A thirty-day extension to produce the documentation listed in paragraph [b], above, may be granted by the facility head upon a showing by the inmate that he has made an attempt to acquire the necessary documentation, but has been prevented from doing so by no fault of his own.

e. All beards will be shaved for the purpose of taking identification photographs during an inmate's initial processing at the facility reception unit, whether or not he has requested permission to grow and maintain a beard because of religious beliefs.

Exhibit 16.

20. The plaintiffs now have beards under ninety-day permits. No evidence was presented as to whether plaintiffs intend to obtain or have obtained a statement from any authoritative source which would enable them to maintain beards on a permanent basis. At the present time, over 200 inmates have temporary permits; eight inmates have permanent permits. Church doctrine does not require beards. Plaintiffs' beliefs regarding beards, though rooted in their interpretation of the Bible, are strictly personal and voluntary and not common among church adherents. None of the three pastors called to testify, including the founder of the Hayden Lake Assembly, had beards nor did several inmate members who testified.

21. The hair and beards restrictions are based largely on the need to identify prisoners, particularly in the event of an escape or other disturbance. Bearded or long-haired inmates often cannot be identified from mugshots on escape fliers if the inmate was clean-shaven at the time of the mugshot. Further, there have been occasions in which prisoners concealed weapons, such as razor blades, in beards.

22. Any inmate asserting that his religious beliefs require that he follow a special diet is subject to the same conditions quoted above regarding facial and head hair. See Exhibit 16. Plaintiffs are now allowed pork-free diets under ninety-day permits. No evidence was presented as to whether plaintiffs intend to obtain or have obtained a statement from an authoritative source which would allow them to continue their dietary habits on a permanent basis. Church doctrine does not require the dietary practices requested by the plaintiffs. Plaintiffs' beliefs regarding these dietary practices, though rooted in their interpretation of the Bible, are strictly personal and not common among church adherents.

23. The CJCC was founded in 1946 by one Wesley A. Swift. Church members look to Swift and his collaborator, Bertrand L. Comparet, for their doctrinal foundations. Central to CJCC theology is the tenet that white Anglo-Saxons (Aryans) are direct decendents of Adam and Eve through the Twelve Tribes of Israel and the other prophet patriarchs of the Old Testament and that they are the sole chosen people of God. Jews are represented to be the literal seed of Satan and Eve. Blacks are represented to be the seed of Cain—one of the offspring of Satan and Eve. All other non-whites are "mongrelizations" of various kinds. The church teaches the inevitability of a race war between whites and non-whites, this war being a fulfillment of biblical Armageddon prophecies. The church's creed is "Christianity is race and race is Christianity." Based on these doctrines, the CJCC emphasizes and teaches strict racial separatism. In other words, white "Aryans" are to be kept separate from all other "mongrel" races.

24. The CJCC as founded by Swift is not and has never been a monolithic national organization; several congregations or assemblies exist in the United States, each with total autonomy from the others on ecclesiastical and administrative matters. Indeed, the Hayden Lake congregation of Richard Butler has set up its own hierarchy and procedure for establishing member churches. Exhibit 10. Though tracing its doctrinal roots to Swift and Comparet, the

Hayden Lake church, and its member congregations, look solely to Butler for guidance on secular and spiritual affairs. *See* Exhibit 10. Member churches within the Hayden Lake realm are given financial, membership and theological guidelines by Pastor Butler from Hayden Lake. *See* Exhibit 10. The Hayden Lake church is thus an independent, autonomous church.

25. Richard Butler founded the Hayden Lake branch of the CJCC in 1975. At approximately the same time he founded an organization known as Aryan Nations. Butler's CJCC assembly in Hayden Lake and the Aryan Nations, while conceptually distinct entities, are in practice, ideology, facilities, leadership, and to a large extent membership, simply different sides of the same coin. The Court finds that the two entities are alter-egoes as evidenced by the following facts:

a. CJCC of Hayden Lake and Aryan Nations were founded and are presently headed by the same man, Richard Butler, Exhibit 18;

b. CJCC and Aryan Nations have identical aims and goals;

c. CJCC and Aryan Nations share the same facilities at the Hayden Lake Compound, including the printing facilities;

d. The names CJCC and Aryan Nations appear together as part of a single logo in church publications and on church letterhead along with the Aryan Nations insignia, indicating that they denominate one entity or organization, Exhibits 18, 24–26;

e. Butler and other CJCC members have commonly referred to CJCC and Aryan Nations as being one and the same; the names are used interchangeably in church and/or Aryan Nations literature, Exhibits 18, 22–26;

f. Aryan Nations is a facade through which the CJCC conducts "secular" activities, e.g., distribution of propaganda, paramilitary training, etc.;

g. Religious matters are discussed at Aryan Nations' functions just as political matters are discussed in CJCC services;

the CJCC and Aryan Nations are two halves of one theopolitical organization.

26. Butler espouses and preaches racial hatred, revenge and violence. In a videotaped sermon at the Hayden Lake compound Butler states: "[A]s long as there were [sic] adversaries in the land, hatred is our law and revenge is your first duty." Videotapes also showed CJCC/Aryan Nations ceremonies and services in the chapel at Hayden Lake. Predominant on the chapel walls and member uniforms are swastikas and other Nazi memorabilia. Videotapes showed Butler's followers engaged in paramilitary maneuvers with firearms and live ammuniton; during these exercises followers are shown shooting at targets depicting Menachim Begin. Exhibits 30–31. Some of Butler's closest associates at Hayden Lake have been recently convicted of racketeering charges in the "Order" trial in Seattle; another has been recently convicted of murder in Missouri.

27. Several incidents of racial violence have occurred at the ISCI during the 1980's, though it is unclear whether the violence involved CJCC members or simply inmates holding similar beliefs. On one occasion, unidentified inmates burned a black inmate's cell door, leaving the outline of a cross on the door. On another occasion, a black inmate was beaten up by white inmates, some of whom having previously expressed white supremacist views, shortly after being moved to their cellblock.

28. The Aryan Nations and CJCC are closely associated and involved with other radical right-wing organizations espousing racial hatred and violence such as the Ku Klux Klan (KKK) and Posse Comitatus. Richard Butler is an active member of the KKK and is an honorary Grand Dragon of the California KKK.

29. Admission of the CJCC into the ISCI would have a strong potential of escalating prison tension, threatening and intimidating minority racial groups, and compromising prison security.

## CONCLUSIONS OF LAW

1. Plaintiffs' claims in this case arise under the free exercise clause of the first amendment. The basic statement regarding first amendment rights of prisoners was enunciated by the United States Supreme Court in *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2827, 41 L.Ed.2d 495 (1974):

> We start with the familiar proposition that lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. In the first amendment context a corollary of this principle is that a prison inmate retains those first amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penalogical objectives of the corrections system. Thus, *challenges to prison restrictions that are asserted to inhibit first amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system to whose custody and care the prisoner has been committed in accordance with due process of law.*

*Id.* at 822, 94 S.Ct. at 2804 (emhasis added); cited with approval in *Jones v. North Carolina Prisoners Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977).

2. Federal courts have generally followed a two-step analysis in cases similar to this one:

> (1) The prisoner has the burden of showing that
>
> (a) His *beliefs are sincerely held;* the first amendment does not extend to so-called religions which are obviously "shams and absurdities" and whose members are lacking in religious sincerity.
>
> (b) The *claim must be rooted in religious belief, not in purely secular or philosophical concerns;* however, the court is not to inquire into the truth, validity or reasonableness of religious beliefs.
>
> (2) If the plaintiff successfully shows the above items, the Government then has the burden of showing that the prisoner's alleged religious rights have been restricted for legitimate reasons such as prison security and rehabilitation.

*See, e.g., Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 713, 101 S.Ct. 1425, 1429, 67 L.Ed.2d 624 (1981); *Wisconsin v. Yoder,* 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *Callahan v. Woods,* 658 F.2d 679 (9th Cir.1981).

3. Regarding the first of the above tests, the Court will assume, for the sake of argument, that plaintiffs' beliefs are sincerely held and "religious" in nature and thus entitled to first amendment protection which is not inconsistent with plaintiffs' status as prisoners.

4. Regarding the second of the above tests, federal courts have applied a varying number of different standards to government action allegedly infringing on prisoners' free exercise rights. *Capoeman v. Reed,* 754 F.2d 1512, 1515 (9th Cir.1985). The Ninth Circuit has not firmly determined the applicable standard, though the court has cited with approval the standard used in *Jones v. Bradley,* 590 F.2d 294 (9th Cir.1979), cited in *Capoeman, supra,* 754 F.2d at 1515. In *Jones, supra,* an inmate challenged the prison's denial of his use of the prison chapel. The court concluded that a prisoner must be given a "reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." 590 F.2d at 296. Prison regulations are to be evaluated in light of the state's legitimate interest in prison security. *Id.* The *Jones* court concluded that the state had a legitimate interest in placing appropriate restrictions on chapel use that were reasonable to maintain order and security. *Id.* There is no indication that "appropriate restrictions" meant the least restrictive means. *See Capoeman, supra,* 754 F.2d at 1515–16. The Court will apply the *Jones/Capoeman* standard to the specific claims made by the plaintiffs in this case.

5. The United States Supreme Court has stated:

> Because the realities of running a penal institution are complex and difficult, we have also recognized the wide-ranging deference to be accorded the decisions of prison administrators.
>
> "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities."

*Jones v. North Carolina*, 433 U.S. at 126, 97 S.Ct. at 2538 quoting *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974).

6. *Right to Hold CJCC Worship Services*

 Initially, the Court notes that both plaintiffs are held in close custody and are thus not entitled to attend the worship services of any denomination in the prison chapel. As with other close custody inmates, plaintiffs can attend the intra-denominational services provided by the LDS, Catholic or Protestant denominations in the close custody housing units. Thus, plaintiffs have not shown that they are treated any differently than other close custody inmates. The testimony presented by the defendants showed that additional security is necessary when services are held in the close custody housing units and thus those services are held on a more limited basis than in the prison chapel. Plaintiffs presented no evidence and elicited no testimony showing that this restriction on close custody inmates is unreasonable or discriminatory. Thus, the Court concludes that plaintiffs' free exercise rights are not infringed by the ISCI denying them permission to hold CJCC worship services in the prison chapel.[3] The Court further concludes that the restrictions imposed by the defendants are reasonable, consistent with the plaintiffs' status as prisoners, and with the legitimate operational considerations of the institution.

7. *Right to Hold CJCC Study Classes*

The Court's discussion regarding worship services in conclusion No. 6 also disposes of this claim. The defendants have a legitimate penalogical interest in seeing that groups such as the CJCC/Aryan Nations are not allowed to congregate in the ISCI. Plaintiffs can discuss informally their religious views as circumstances permit with other inmates—and have obviously done so—but may be prevented, in the interest of prison security, from having formal group meetings.

8. *Right to Hold Banquets on Religious Holidays*

The evidence is undisputed that no banquets are allowed for any religious denominations in the ISCI. Plaintiffs failed to present any evidence on the religious basis for their banquets, that they made requests for banquets, or when such banquets would be desired.

---

**3.** It is unclear whether plaintiffs seek to assert the rights of inmate members of the CJCC who are in medium custody and are thus allowed to attend chapel worship services. Even assuming that plaintiffs have standing to assert such third party rights, it would not change the outcome in the present case. In *Cruz v. Beto*, 405 U.S. 319, 322, n. 2, 92 S.Ct. 1079, 1081, n. 2, 31 L.Ed.2d 263 (1972), the United States Supreme Court stated:

> We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty.

Testimony indicated that there are only eight to twelve inmates who are members of the CJCC, though a somewhat greater number have interest in church teachings. More importantly, however, the defendants have a legitimate security interest in excluding the CJCC from holding group meetings in the ISCI because of the potential for escalating racial tensions within the prison.

### 9. *Right to Distribute Church Literature*

Plaintiffs presented no evidence regarding any restrictions on their right to distribute CJCC literature. Testimony showed that plaintiffs and other inmate members may receive church literature by mail and in fact have done so. Other testimony indicated the plaintiffs have discussed and shared church literature with other inmates. Plaintiffs have failed to satisfy their burden of proof on this claim. Further, in *North Carolina Prisoners Union, supra,* the Supreme Court held that state correctional officials were not required under the first amendment to allow prisoners labor union to solicit other inmates to join the union or to allow inmate union members to distribute literature about the union to other inmates. The Court found that the institution's interest in avoiding "friction" between inmates and between inmates and prison personnel justified the restriction on first amendment rights. 433 U.S. at 130–33, 97 S.Ct. at 2540–41.

### 10. *Right to Confer with CJCC Ministers on a Personal and Group Basis*

The testimony indicated that plaintiffs have been allowed individual visits from CJCC ministers. Plaintiffs presented no evidence of discrimination against them regarding visitation rights. As to visits on a group basis, the Court's discussion in conclusions Nos. 6 and 7, above, is dispositive in denying this claim also.

### 11. *Right to Grow Facial Hair*

■ Like all other inmates, plaintiffs are allowed to grow beards on a temporary permit basis. Beards may be kept permanently if inmates, regardless of which religion they belong to, can satisfy reasonable administrative requirements as listed in Exhibit 16, quoted above. The Court concludes that these restrictions are consistent with prison objectives of identifying prisoners and preventing concealment of weapons and contraband in facial hair. The record shows that religious groups are treated equally on this matter. Thus, no constitutional infringement exists.

### 12. *Right to Special Dietary Considerations*

The Court's discussion in conclusion No. 11, above, is also dispositive of this issue.

### 13. *Right to Unlimited Number of Church Publications*

■ The Court believes that the prison's personal property limitation of six cubic feet per inmate is reasonable in light of the need for rapidity and thoroughness of cell searches. Prison officials stated that so long as personal property does not exceed six cubic feet, exceptions may be made to the ten-book and/or magazine rule on a case-by-case basis. To this date, plaintiffs have made no such request nor have they filed any grievance.

■ 14. Prison officials, such as defendants Murphy and Arave, are entitled to qualified immunity from money damages in § 1983 suits. *Cleavinger v. Saxner,* ___ U.S. ___, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985). Insofar as the defendants' conduct did not violate clearly-established statutory constitutional rights of which a reasonable person would have known, they are immune from money damages. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Defendants testified that they believed that their actions were in line with existing caselaw. The Court's present ruling as well as the authorities cited herein support their conclusion. Plaintiffs presented no evidence which would justify imposition of punitive damages in this case and the Court will deny such.