**Melvin A. McCABE and Mark H. Madsen, Plaintiffs-Appellants,**

v.

**Arvon J. ARAVE, Warden, Idaho State Penitentiary; Al Murphy, Director, Idaho State Department of Corrections, Defendants-Appellees.**

No. 86–3640.

United States Court of Appeals, Ninth Circuit.

Submitted June 24, 1987.

Decided Sept. 11, 1987.

Melvin A. McCabe, pro se.

Mark H. Madsen, pro se.

Anthony G. Cootz, Lay Representative, Idaho State Corr. Inst., Boise, Idaho, for plaintiffs-appellants.

James T. Jones, D. Marc Haws, and Robert R. Gates, Boise, Idaho, for defendants-appellees.

Before BROWNING, WRIGHT, and BOOCHEVER, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This case requires us to determine the constitutionality of regulations governing prisoners at the Idaho State Correctional Institution in Boise. We affirm the district court's judgment in favor of the state on the issues of group worship and group study by Church Jesus Christ Christian (CJCC) close-custody inmates, but reverse it as to the ban on storage of CJCC literature in the chapel library. We also vacate the portion of the judgment that pertains to facial hair and pork-free diets.

## I. Background

McCabe and Madsen,[1] members of the CJCC, are close-custody inmates at the Idaho prison. They asked prison officials to allow them to hold congregational worship services and study classes with CJCC ministers. The prison chaplain requested information concerning the church and the Aryan Nation from McCabe. The chaplain was given only two documents. These were presented to the prison's religious advisory council, composed of religious leaders in Boise, which recommended that the requests be denied.

Respondent Murphy, the Director of the Department of Corrections, visited the Hayden Lake compound where he spoke with Reverend Butler, the leader of both the CJCC and Aryan Nation. He then denied plaintiffs' request.

Plaintiffs filed a section 1983 action alleging violations of their First Amendment rights. Specifically, they challenged the prison policy and regulations that prohibit their group study and worship, ban CJCC literature from the chapel library, and condition their ability to eat a pork-free diet and grow beards on the beliefs of other CJCC members.

The district court, while noting that the Aryan Nation was the alter ego of the CJCC, assumed that the CJCC was a religion. It found that Reverend Butler espouses racial hatred, revenge and violence and that admission of the CJCC to the prison would have a strong potential for compromising prison security. It found that, while 20 to 40 books are strongly suggested by the church, the plaintiffs had not used a grievance procedure to request an exception to the prison's ten book limit. It did not rule on the legality of the procedure or the alternative of storing books in the chapel library. It found that plaintiffs' beliefs concerning facial hair and pork-free diets were not required by the CJCC and were not common among its adherents. It gave judgment to the state officials.

---

1. We stayed our decision in this case pending the Supreme Court's decision in *O'Lone v. Estate of Shabazz,* — U.S. ——, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). We have been advised by supplemental briefs that Madsen is no longer incarcerated, but that McCabe remains in prison. A case or controversy thus remains.

## II. First Amendment Claims

The Supreme Court has now clearly set forth the test for determining the constitutionality of regulations that impinge on the First Amendment rights retained by prisoners: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 107 S.Ct. at 2404; *Turner v. Safley*, — U.S. ——, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).[2]

■ In determining whether the challenged regulations are valid under that test, we are directed to consider (1) whether the regulation has a logical connection to the legitimate government interests invoked to justify it, (2) whether there are alternative means of exercising the rights that remain open to the inmates, (3) the impact that accommodation of the asserted constitutional right will have on other inmates, guards, and prison resources, and (4) the presence or absence of ready alternatives that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. *Turner*, 107 S.Ct. at 2262; *O'Lone*, 107 S.Ct. at 2405–06. There is no separate burden on prison officials to prove that no reasonable method of accommodating the prisoner's constitutional complaint exists. *O'Lone*, 107 S.Ct. at 2405; *Turner*, 107 S.Ct. at 2262. We now evaluate the prisoners' claims in light of these factors.

■ McCabe and Madsen first claim that prison officials acted unconstitutionally in refusing to allow them to worship and study in groups. The court found that CJCC members were treated equally with other close custody inmates in this regard, *McCabe v. Arave*, 626 F.Supp. at 1206, and that Reverend Butler preaches racial hatred, revenge, and violence. *Id.* at 1204. Given these findings, we find the refusal to permit group worship or study to be logi-

cally connected to the legitimate government interests of security and safety that were invoked to justify it.

■ The second consideration, alternative means of exercising the right, also weighs in favor of prison officials. They now permit the prisoners to visit individually with CJCC ministers. *Id.* at 1202. Although these visits are not a perfect substitute, they certainly qualify as a reasonable alternative to group worship for close custody inmates.

■ Third, permitting group worship and study by close custody CJCC members would adversely affect the rights of others and prison resources. The security concerns expressed by prison officials are entitled to respect and deference. *See O'Lone*, 107 S.Ct. at 2405; *see also Toussaint v. McCarthy*, 801 F.2d 1080, 1104 (9th Cir. 1986). Officials said that group worship and study would result in a heightened possibility of violence. The safety and lives of guards and other inmates would be jeopardized by such violence, and its prevention would burden prison resources.

Fourth, no ready alternatives that fully accommodate prisoners' rights at a *de minimis* cost to valid penological interests are apparent. Having worship services supervised by guards would do little to prevent espousal of violence by CJCC members. The prison ban on CJCC group worship and study is constitutional.

McCabe and Madsen next attack the ambiguous prison regulation that restricts inmates to ten books or to ten books and ten magazines. They assert that the officials' failure to allow storage of CJCC literature in the chapel library is unconstitutional.

■ Examining the claim in light of *Turner* and *O'Lone*, we conclude that the regulation cannot stand in its present form.[3] In determining whether a regula-

---

2. The district court assumed, without deciding, that plaintiff's beliefs were sincerely held and that the CJCC qualified as a religion. *See McCabe v. Arave*, 626 F.Supp. 1199, 1205 (D.Idaho 1986). We rely on these assumptions.

3. Although the same result is likely under the heightened scrutiny of *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), we decline to apply that standard here where the only question presented is the availability of storage space for the prisoners' literature.

tion has a valid and logical connection to a legitimate government interest, the Supreme Court has stressed that the government objective must be a legitimate and neutral one. *Turner*, 107 S.Ct. at 2262. Here, officials attempt to prevent violence and the spread of racism by banning CJCC literature from the chapel library. They do provide storage space for literature possessed by inmates of other faiths.

While these objectives are laudable, the officials are regulating on the basis of the content of the literature. The Supreme Court has consistently noted the absence of content regulation in upholding regulations that infringed on the First Amendment rights of prisoners. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 551, 99 S.Ct. 1861, 1880, 60 L.Ed.2d 447 (1979); *Pell v. Procunier*, 417 U.S. 817, 828, 94 S.Ct. 2800, 2807, 41 L.Ed.2d 495 (1974).

■ Some content regulation is permissible in the prison context. *See Procunier v. Martinez*, 416 U.S. at 416, 94 S.Ct. at 1812 (suggesting material that might be thought to encourage violence could be banned); *Murphy v. Missouri Dep't of Corrections*, 814 F.2d 1252, 1257 (8th Cir.1987) (Aryan Nation materials that advocate violence or that are so racially inflammatory as to be reasonably likely to cause violence can be banned); *Aikens v. Jenkins*, 534 F.2d 751, 757 (7th Cir.1976) (*Procunier* does not prohibit ban on literature that may reasonably be thought to encourage violence). As these bans were upheld under the standard of *Procunier*, such literature can certainly be banned under the less rigorous standard of *Turner* and *O'Lone*. Evidence presented to the district court, however, showed that not all CJCC literature could be characterized as posing a threat of violence.

The difficult question then is whether the remaining literature can be banned because it advocates racism or racial purity. Given the strength of First Amendment protection for freedom of belief (*see, e.g., Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940)), prison authorities have no legitimate penological interest in excluding religious books from the prison library merely because they contain racist views. Courts have repeatedly held that prisons may not ban all religious literature that reflects racism. *Aikens v. Jenkins*, 534 F.2d 751, 756–57 (7th Cir. 1976); *Long v. Parker*, 390 F.2d 816, 822 (3rd Cir.1968).

The other factors *Turner* and *O'Lone* direct us to consider also weigh in favor of the prisoners. No viable alternative means of exercising these rights appear to exist because 20 to 40 books are strongly suggested for plaintiffs to study so that they may properly understand CJCC doctrine. The impact of admission of properly censored materials on guards, other inmates, and prison resources appears minimal and storage represents a ready alternative at a *de minimis* cost to legitimate penological interest.

We hold, therefore, that literature advocating racial purity, but not advocating violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as to be reasonably likely to cause violence at the prison, cannot be constitutionally banned as rationally related to rehabilitation. The regulation is too restrictive. The prisoners are entitled to storage privileges for properly censored literature similar to those afforded other inmates. *See Jones v. Bradley*, 590 F.2d 294, 296 (9th Cir.1979) (quoting *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972)).[4]

We come now to plaintiffs' claims that prison regulations governing facial hair and special diets unconstitutionally condition their ability to exercise religion on the beliefs of others. *See, e.g., Thomas v. Review Board*, 450 U.S. 707, 715, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981); *Callahan v. Woods*, 658 F.2d 679, 685–86 (9th Cir.1981); *Africa v. Pennsylvania*, 662 F.2d 1025, 1029 n. 5 (3d Cir.1981), *cert. denied*, 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982). The regulations re-

---

**4.** The chaplain admitted that storage space was available. This is not a case where the prison is being asked to provide special facilities to a few inmates. *See Cruz v. Beto*, 405 U.S. at 322 n. 2, 92 S.Ct. at 1081 n. 2.

quire the plaintiffs to obtain a statement from a recognized spokesman or authority of the professed religion stating that the practice is "deeply rooted in the religious beliefs" of the religion.

■ While there is no requirement that administrative remedies be exhausted in cases brought under 42 U.S.C. § 1983, *Shell Petroleum, N.V. v. Graves,* 709 F.2d 593, 597 (9th Cir.), *cert. denied,* 464 U.S. 1012, 104 S.Ct. 537, 78 L.Ed.2d 717 (1983); *Murphy,* 814 F.2d at 1257, the claim must be ripe, and not moot, to be reviewed properly.

■ McCabe and Madsen presented no evidence whether they intend to obtain, can obtain, or have already obtained the statement required for a permanent permit for a beard or special diet. They were granted temporary permits. There has been no showing that the regulations have been enforced. The supplemental briefs disclosed substantial changes in the regulation governing facial hair. Federal courts should not decide hypothetical questions. *California Energy Resources Conservation & Dev. Comm'n v. Johnson,* 807 F.2d 1456, 1463 (9th Cir.1986); *see also Murphy,* 814 F.2d at 1257 (8th Cir.1987). The court erred in doing so.

### III. The Videotape

■ The state offered a videotape of CJCC–Aryan Nation sermons and ceremonies to illustrate photographer Lake's testimony. The plaintiffs did not object to the use of the videotapes for illustrative purposes. The court admitted them for that purpose. The court's findings of fact, however, referred to the videotape rather than to Lake's testimony.

The court may have erred. The role of illustrative evidence is "preferably that of a testimonial aid for a witness or as an aid to counsel during argument." *United States v. Cox,* 633 F.2d 871, 874 (9th Cir. 1980), *cert. denied,* 454 U.S. 844, 102 S.Ct. 159, 70 L.Ed.2d 130 (1981); *see also United States v. Krasn,* 614 F.2d 1229, 1238 (9th Cir.1980). *But see McCormick on Evi-*

*dence* 671 (Cleary 3d ed. 1984) (practice of admitting photographs as illustrative evidence, but denying them substantive effect, creates a groundless distinction).

Reversal is required, however, only if the error affected the substantial rights of the parties or is "inconsistent with substantial justice." *See Powell v. Levit,* 640 F.2d 239, 241 (9th Cir.) (section 1983 action), *cert. denied,* 454 U.S. 845, 102 S.Ct. 160, 70 L.Ed.2d 131 (1981). A review of the record indicates that the videotapes were cumulative. Lake had already testified to the events depicted in the tapes. There was no reversible error.

### IV. Motion for Sanctions and Contempt

We are asked also to determine whether the district court properly denied plaintiffs' motion for sanctions and contempt. We review for an abuse of discretion. *Gifford v. Heckler,* 741 F.2d 263, 266 (9th Cir.1984).

Defendants failed to file a timely answer to plaintiffs' complaint. Fed.R.Civ.P. 12. Plaintiffs filed a motion for contempt and sanctions before trial and at trial requested specifically that defendants' defenses be struck from the answer that plaintiffs received the day of trial. Judge Callister delayed ruling on the motion for contempt and sanctions until after trial when he denied it, finding no prejudice to plaintiffs.

■ For a sanction to be validly imposed, the conduct in question must be sanctionable under the authority relied on.[5] *United States v. Stoneberger,* 805 F.2d 1391, 1392 (9th Cir.1986). As authority for the imposition of sanctions, plaintiffs relied on Federal Rule Civil Procedure 70. Federal Rule Civil Procedure 70, however, is operative only when a party refuses to comply with a judgment. *De Beers Consolidated Mines, Ltd. v. United States,* 325 U.S. 212, 218, 65 S.Ct. 1130, 1133, 89 L.Ed. 166 (1945). Federal Rule Civil Procedure 70 cannot be used as the authority for contempt or sanctions where defendants failed to answer on time.

5. Fed.R.Civ.P. 12 does not provide a specific sanction for late filing of an answer.

The district court could, however, have imposed sanctions by exercising its inherent power.[6] *Stoneberger*, 805 F.2d at 1393 (citing *Roadway Express, Inc. v. United States*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980)). The court would have to make a finding of bad faith. *Stoneberger*, 805 F.2d at 1393; *Miranda v. So. Pacific Transp. Co.*, 710 F.2d 516, 520 (9th Cir.1983). Judge Callister accepted the defense attorney's statement that the answer was not filed timely because of "inadvertence." He is in the better position to assess counsel's credibility. Defendants' participation in discovery lends further support to a good faith, but inadvertent, failure to file an answer. We cannot say that the judge abused his discretion in denying plaintiffs' motion for sanctions.

Nor can we say that he abused his discretion when he denied the contempt motion. Although defendants filed late, they did file an answer. A court has wide latitude when it determines whether there has been a contemptuous defiance of its order. *Gifford*, 741 F.2d at 266. Although Judge Callister did not abuse his discretion, this court strongly disapproves of the state's failure to file a timely answer.

We REVERSE the judgment of the district court insofar as it upholds the ban on the storage of properly censored CJCC materials in the chapel library. We VACATE the portions of the judgment that concern facial hair and special diet. The judgment, including the denial of money damages, is otherwise AFFIRMED.[7]

---

6. Although the authority cited by the plaintiffs is incorrect, courts are to make reasonable allowances for pro se litigants and to read pro se papers liberally. *Traguth v. Zuck*, 710 F.2d 90, 95 (2nd Cir.1983). The analysis, therefore, includes the possibility of the court imposing sanctions based on its inherent powers.

7. "Because the damage claims are asserted against the defendants in their official capacities, they are barred by the eleventh amendment." *Rodriguez v. James*, 823 F.2d 8, 11 n. 3 (2d Cir.1987).