Michael **STEFANOW**, Plaintiff–Appellant,

v.

James **McFADDEN**, Warden; Dr. McKinley; Mike Shuller, Nurse, Special Management Unit; Sgt. Manriquez; Officer Brydon; CSO Martinez; CSO Simms; CSO Granillo; J. Polley; Wes Mayhew, Administrative Assistant, Defendants–Appellees.

No. 95–16134.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 1996.

Decided Dec. 27, 1996.

munity defense.

Jess A. Lorona, Burch & Cracchiolo, Phoenix, AZ, for plaintiff-appellant.

R. Elizabeth Teply and Thomas J. Dennis (on the briefs), and Darrin J. DeLange (argued), Assistant Attorneys General, Phoenix, AZ, for defendants-appellees.

Before: RONEY,* BEEZER, and TROTT, Circuit Judges.

## OPINION

TROTT, Circuit Judge:

This appeal arises from a suit brought by Michael Stefanow ("Stefanow"), a prisoner in the Arizona State Prison Complex, against the prison warden and other prison officials (collectively, the "prison officials") pursuant to 42 U.S.C. § 1983. We must decide whether the prison officials' confiscation of *Christianities Ancient Enemy,* a book sent to Stefanow by the pastor of his church, violated Stefanow's First Amendment rights of free exercise of religion and free speech. Because Stefanow's religion does not require him to read *Christianities Ancient Enemy,* we conclude that the prison did not violate Stefanow's free exercise rights under the Religious Freedom Restoration Act. Also, because confiscation of the book was reasonably related to the prison's legitimate penological interests, the prison did not violate Stefanow's free speech rights in keeping it from him. Accordingly, we affirm the judgment of the district court in favor of the prison officials.

## BACKGROUND

Stefanow is a prisoner at the Arizona State Prison Complex in Florence, Arizona. During his incarceration, Stefanow has committed numerous security violations for threatening staff and other prisoners, possessing prison-made knives and shanks, and possessing narcotics. Because the prison officials believe him to be a high security risk, Stefa-

---

* The Honorable Paul H. Roney, Senior Circuit Judge for the Eleventh Circuit, sitting by designation.

now is housed in the Special Management Unit, a cellblock used to house inmates with disciplinary problems and to isolate dangerous inmates from other prisoners.

Stefanow is a practitioner of "Christian Identity," which he says is a religion. He is a member of the "Church of Jesus Christ Christian" ("CJCC") and of the Aryan Nations, a branch of the CJCC that caters to prisoners by sending them literature and religious materials. The Christian Identity religion teaches that white Aryans are the true Israelites and that the promises of the Bible apply to white Aryans, not to Jews. The prison officials believe that the Christian Identity religion promotes white supremacy and is affiliated with the Ku Klux Klan and the Aryan Brotherhood, a prison gang that advocates white supremacy. Although Stefanow denies that his religion advocates white supremacy and racism, he admits that it teaches him to "keep separate" from other races.

Stefanow's CJCC pastor, Gordon "Jack" Mohr ("Mohr"), has authored several books that he sends to prisoners around the country. The prison officials have allowed Stefanow to possess and study several of Mohr's books, including *The Enemy Within, Know Your Enemies, Mind Control, Who are the Jews*, and *Behold the International Jew*. But when Mohr sent Stefanow *Christianities Ancient Enemy*, prison officials, after reviewing its content, seized the book as contraband. They confiscated the book because in the warden's considered opinion, it contains material that poses a threat to the safe, secure, and orderly operation of the prison.

In *Christianities Ancient Enemy*, Mohr aggressively promotes the idea that America's so-called "Zionist Occupied Government (ZOG)" is controlled and manipulated by people of the Jewish faith. In Mohr's words:

WE KNOW ... about the Rockefeller–Rothschild Jewish Group which dominates this nation, and most of the Free World. It has been studied for years. We know that this One World Group intends to enslave all of us, and kill some of us as their agents have done all around the world. We know that their Number One motive is the "destruction of White Christian civili-

zation." For this has been the bulwark of freedom in this world for almost 2,000 years.

*Christianities Ancient Enemy* at 134.

As evidence of this alleged, nefarious world conspiracy, Mohr describes atrocities that Jews supposedly have committed against Christians throughout history. According to Mohr, Jews have been responsible for communist oppression, for "torture[ ] and murder[ ] by the countless thousands" in the Soviet Union, China, and North Korea, *id.* at 117, and for "chang[ing] America from a Constitutional Christian Republic, into a Socialist Welfare State ... which is very close to a Zionist controlled (ZOG) New World Order dictatorship." *Id.* at 121

In response to the alleged conspiracy, Mohr espouses a "perfect hatred" for those who do not accept Christianity, *id.* at 74, and declares that "freedom, dignity (racial pride), the protection of our women and children, and our God, are the only things worth fighting and dying for." *Id.* at 134. He tells his readers that no Jew is "really innocent" of the evil perpetrated "by their International leaders," and that "[i]n time of war, as people struggle for survival (and we are in a war for survival, right now, whether you are willing to admit it or not), there is no time to pick the innocent from the guilty. If they stand under the enemy flag, they must be considered as enemy and your foe." *Id.* at 139.

Mohr's solution to. this dilemma is for white Christians "to attack the problem, if [they] wish to remain free." *Id.* at 136. Thus, he calls for an "unorganized militia" to protect the borders from unlawful immigration, *id.* at 135, and pleads for white Christians to "start by preparing the groundwork for battle" between Judaism and Christianity. *Id.* at 137. "Both figuratively and literally," Mohr declares, "there will be live heroes and dead cowards when the dust of battle lifts from this spiritual conflict." *Id.* at 141.

Mohr's closing call to arms is representative of the book's incendiary content and its hateful tone:

As more and more Christians begin to realize how self-styled Jews have spent

millions of dollars to manufacture Jewish myths for Christian consumption, and that they have done this both for economic and political advantage, you will see a tremendous explosion against Jews in this country. It is coming and knowledgeable Jewish leaders know this and admit it! The unfortunate thing is that the "little Jew," the fellow we are more apt to rub shoulders with in the business world, and who knows little about what is happening at the international level, is the one who will bear the brunt and be hurt the worst. It has always been thus....

How close are they to their planned takeover? As far back as 1950, Supreme Court Justice Murphy, who had been U.S. Attorney General under Franklin Roosevelt said: "We are doomed! They are too strong! They are now in complete control! They now have complete control of the President and our government."

Friends, we have gone a long way "down hill" since 1950. The only thing which is holding America back from complete disaster, is a remnant of Christians who have not become conditioned to the World Brotherhood Program, or to the indoctrination of the International Zionists and their Talmudic faith.

*　　*　　*　　*　　*　　*

Do you really care about the future of our White race, our family and our country? If you do, would you join me in this Pledge today, before Almighty God: "I shall no longer ask myself is this or that expedient, only if it is right! I shall do this, not because it is noble or unselfish, but because life is slipping away and because I need for my journey a compass that will not lie. I will put my faith in God, rather than in what man says. I will do this because I no longer aspire to the highest with one part of me and deny it with another. This STAR will be God's WORD."

Victory will be accomplished, my friends, when true Christians are willing to shake off the shackles of ignorance and superstitions and rise up in the strength and truth of our King! This world belongs to Him! One with Him will be a majority! There are more of us, than there are of them. Why should we surrender and like cowed galley slaves be beaten to death?

*Id.* at 142–44.

After the prison officials confiscated *Christianities Ancient Enemy*, Stefanow filed a complaint pursuant to 42 U.S.C. § 1983. He alleged, among other claims, that confiscation of the book violated his First Amendment rights of free speech and free exercise of religion. During a bench trial, Stefanow testified that his faith mandates daily study of religion and that the Bible is the central and sacred text upon which his religion is based. Stefanow testified that access to Mohr's materials is necessary to the practice of his religion because Mohr explains things in the Bible in a clear way, making them easy to understand. He admitted, however, that his religion does not require him to study *Christianities Ancient Enemy*.

The warden and the chaplain for the Arizona State Prison Complex testified that they believe the book advocates violence and dissension against Jews and against the government. As evidence, they cited, among other passages, the book's call for an "unorganized militia," its references to law enforcement officers as agents of the "Zionist Occupied Government," and its espousal of a "perfect hatred" for Jews. They also testified that books advocating racial hatred and violence are like "gunpowder" in the prison setting, because they incite violence and interfere with rehabilitation. Specifically, the warden explained that:

I think to give [violent prisoners] access to something that creates and encourages this sort of a belief that they as a group are being put upon; ... that there's a threat to their very being and well-being by people of another race, that this other race and these other people in fact control the government, control the people who are in charge of incarcerating them, I think all of that puts them in a position that gives some legitimacy and would justify actual violence against members of other races and actual violence against the correctional officers themselves.

The district court entered judgment in favor of the prison officials. The court concluded that, because Stefanow's religion does not require him to read *Christianities Ancient Enemy*, confiscation of the book did not violate his free exercise rights under the Religious Freedom Restoration Act. Also, the district court found that the "racially based statements and principles set forth in *Christianities Ancient Enemy* would be reasonably likely to cause violence if allowed in a prison setting." Thus, the district court rejected Stefanow's free speech claim because it concluded that confiscation of the book was "directly related to the prison's goal of preventing violence and ensuring the safety of inmates and staff." Finally, the court ruled that, even if confiscation of the book had violated Stefanow's constitutional rights, the defendants were entitled to qualified immunity.

## STANDARD OF REVIEW

 Whether the prison violated Stefanow's First Amendment rights of free speech and free exercise of religion is a mixed question of law and fact. *See Friedman v. Arizona*, 912 F.2d 328, 331 (9th Cir.1990), *cert. denied*, 498 U.S. 1100, 111 S.Ct. 996, 112 L.Ed.2d 1079 (1991). We review Stefanow's First Amendment claims de novo because "the application of law to fact will require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles." *Id.* (quoting *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)).

## DISCUSSION

### I. Free Exercise of Religion

The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb–4, provides that the government shall not substantially burden a person's exercise of religion unless its action is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000bb–1. RFRA's purpose is "to restore the compelling interests test . . . in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb–1(b)(1). Because of this broad purpose, we have held that RFRA governs prisoners' free exercise claims. *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir.1995).

· Under RFRA, Stefanow must make a threshold showing that the confiscation of *Christianities Ancient Enemy* imposes a "substantial burden" on his exercise of religion. *Id.* In order to show a free exercise violation under the "substantial burden" test, Stefanow must prove that confiscation of *Christianities Ancient Enemy* prevents him from engaging in conduct or having a religious experience that his faith mandates. *Id.* "This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine." *Id.* (quoting *Graham v. Commissioner*, 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd sub nom. Hernandez v. Commissioner*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)).

Stefanow does not contend that his Christian Identity religion requires him to read *Christianities Ancient Enemy* or that the book is central to his religious practices. He admits that his religion only requires him to study the Bible, a fact confirmed by the prison chaplain, who has reviewed Christian Identity teachings and literature. This fact is also confirmed by Mohr himself, who instructs his readers to "study the Bible for themselves, without relying on their pastor or some Bible scholar to tell them what it means." *Christianities Ancient Enemy* at 17.

The prison allows Stefanow to possess the Bible and to possess some Bible study materials, including several of Mohr's books. The prison also allows Stefanow to study and pray at will. Because the prison has not prevented Stefanow from studying books or engaging in any practices mandated by his religion, it has not substantially burdened Stefanow's free exercise of religion. Accordingly, we affirm the district court's judgment in favor of the defendants on Stefanow's free exercise claim.

## II. Free Speech

Stefanow also claims that confiscation of the book violated his First Amendment rights of free speech. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). In determining whether the confiscation of *Christianities Ancient Enemy* is valid under this test, we must consider: (1) whether the regulation has a logical connection to the legitimate government interests invoked to justify it; (2) whether there are alternative means of exercising the rights that remain open to the inmate; (3) whether accommodation of the asserted constitutional right will have an impact on other inmates, guards, and prison resources; and (4) whether there are ready alternatives that fully accommodate the prisoner's rights at de minimis cost to valid penological interests. *Id.* at 89–90, 107 S.Ct. at 2261–62.

Applying these factors, we conclude that the prison's action meets the reasonable-relation test of *Turner.* All four factors support the prison officials' confiscation of the book.

### A. Logical Connection to the Prison's Legitimate Interests

First, for a prison action affecting constitutional rights to be upheld, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89, 107 S.Ct. at 2262 (quoting *Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984)). Moreover, the prison's proffered objective must be a "legitimate and neutral one." *Id.* at 90, 107 S.Ct. at 2262.

Here, the prison confiscated *Christianities Ancient Enemy* because of its concern that the book threatened the security of inmates and prison staff. Prison security is undoubtedly a legitimate-even a compelling-interest. However, because the prison confiscated *Christianities Ancient Enemy* on the basis of its content (advocacy of racism and violence), we must scrutinize the prison's asserted justification more closely. *See id.* at 90,

107 S.Ct. at 2262 ("We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression.").

In *McCabe v. Arave,* 827 F.2d 634, 638 (9th Cir.1987), we held that some content regulation is permissible in the prison context. Specifically, materials that pose a threat to security in the prison or a threat to another legitimate penological interest can be excluded on the basis of content. *Id.; see also Harper v. Wallingford,* 877 F.2d 728, 733 (9th Cir.1989) (upholding prison ban on materials promoting sexual relationships between adult males and juvenile males because the materials pose a threat of violence in the prison and impede prisoner rehabilitation).

In *McCabe,* the prison, in order to prevent violence and to prevent the spread of racism, had refused to allow storage of CJCC materials in the prison library. *McCabe,* 827 F.2d at 638. We held that the prison regulation was too restrictive because it excluded books that merely contained racist views. Only literature that poses a threat of violence within the prison, we held, can be constitutionally banned as rationally related to the prison's interest in preventing violence. *Id.*

Thus, under *McCabe,* we must determine whether *Christianities Ancient Enemy* poses a threat of violence within the prison, either because it advocates violence, *or* because it is "so racially inflammatory as to be reasonably likely to cause violence at the prison." *Id.* Merely "advocating racial purity" is insufficient to justify confiscation. *Id.*

Anyone familiar with prisons understands the seriousness of the problems caused by prison gangs that are fueled by actively virulent racism and religious bigotry. Protecting staff from prisoners and prisoners from each other is a constant challenge. The warden, the deputy warden, and the chaplain for the Arizona State Prison Complex, where Stefanow lives, all testified that the inflammatory nature of the content of Mohr's book poses a threat of violence to prisoners of other races and to the staff of that prison, whom the book generally identifies as agents of the so-called Zionist Occupation Govern-

ment. The security concerns of prison officials are entitled to respect and deference by the courts. *Harper*, 877 F.2d at 733. Judgments regarding prison security "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974).

We find no evidence in the record to suggest that the prison officials' security concerns are unreasonable or exaggerated. *Christianities Ancient Enemy* does more than merely advocate racism; it promotes the idea that white Christians are being oppressed by a worldwide conspiracy-a conspiracy that controls the government of the United States and, by implication, the prisons. The book issues a call to arms for white Christians to fight back in a "war for survival." The prison officials reasonably concluded that this material is so inflammatory it is reasonably likely to incite violence in the prison.

One cannot underestimate the power of ideas to incite consequential behavior. As Judge Learned Hand said in *Masses Pub. Co. v. Patten*, 244 F. 535, 540 (S.D.N.Y.1917), "[w]ords are not only the keys of persuasion, but the triggers of action...." In November, 1095, for example, Pope Urban II issued to the council of Clermont in Auvergne, France, a call to arms for the Christian faithful to rescue Jerusalem from the grip of "an accursed race." 4 Will Durant, *The Story of Civilization: The Age of Faith* 587 (1950); *see also* 1 Eugen Weber, *The Western Tradition* 279–285 (5th ed.1995). Over the next 200 years, wave after incarnadine wave of resulting crusaders vainly lost their lives and spilled the blood of others in a protracted holy war against the Moslems. Durant, *supra*, at 587. The First Crusade's cleansing of Jerusalem included the herding of all Jews into a synagogue where they were burned alive. *Id.*

Hitler in his time used words as sparks from a perverse flint to ignite a more recent holocaust against the Jews. Inflamed by his rhetoric, hoards of his disciples gassed and incinerated his targets. Although one doubts that Mohr is such a rough beast slouching to be born, his venomous doctrine surely follows in Hitler's footsteps.

Mohr's hate would be entitled to First Amendment protection in the free marketplace of ideas, but Stefanow has for the time being encumbered his right to participate in this exchange. He is in prison where the usual constitutional rules are somewhat different. In Justice Holmes's words, "the character of every act depends upon the circumstances in which it is done." *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). Mohr's call to arms poses a more immediate and dangerous threat of violence in the prison context than it would outside the prison. As Justice Douglas explained in *Dennis v. United States:*

> There comes a time when even speech loses its constitutional immunity. Speech innocuous one year may at another time fan such destructive flames that it must be halted in the interests of the safety of the Republic. That is the meaning of the clear and present danger test. When conditions are so critical that there will be no time to avoid the evil that the speech threatens, it is time to call a halt. Otherwise, free speech which is the strength of the Nation will be the cause of its destruction.

341 U.S. 494, 585, 71 S.Ct. 857, 905, 95 L.Ed. 1137 (1951) (Douglas, J., dissenting).

Thus, in deciding that this book poses a realistic threat of violence, we are mindful of the peculiar characteristics of the prison setting.

> Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for anti-social criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others.

*Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). In short, the mix of different races and religions assembled in a prison setting is potentially volatile, because many of the inmates already have demonstrated a tendency toward violent, anti-social behavior and irrational thought. Stefanow's own aggressive behavior and his status as a guest of the Special Management Unit has not escaped our attention.

Stimuli that are inert in the outside world can be catalysts for conflagration in the prison setting. We would add fuel to the fire if we required the prison to introduce material calling for white Christians to fight a war for freedom against other races and against the allegedly corrupt government that incarcerated them. To introduce this book and its advocacy into this setting is the functional equivalent of permitting someone falsely to shout "fire" in a crowded theater. *See Schenck,* 249 U.S. at 52, 39 S.Ct. at 249.

In short, the connection between the confiscation of *Christianities Ancient Enemy* and the prison's asserted security concerns is by no means "so remote as to render the policy arbitrary or irrational." *Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2262. On the contrary, the prison officials' legitimate security concerns are well-founded in light of the book's combination of extreme and vile racist views with its explicit call to arms. This call in the prison context cannot be dismissed as a harmless metaphor. Therefore, the first *Turner* factor weighs in favor of the defendants.

### B. Alternative Means of Exercising the Right

■ "Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.'" *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262 (quoting *Pell,* 417 U.S. at 827, 94 S.Ct. at 2806). Here, the prison has allowed Stefanow access to many of Mohr's other books and generally has allowed him a good measure of religious freedom. Although there are no alternative means for

Stefanow to read *Christianities Ancient Enemy,* Stefanow's access to other CJCC materials that do not violate the prison security policy remains unrestricted. So long as the prison continues to allow access to these materials on an appropriate, selective basis, Stefanow has ample alternative means of studying the teachings of his church. Because the prison has not deprived Stefanow of all avenues for exercising his First Amendment rights, the second *Turner* factor also favors upholding the prison's confiscation of *Christianities Ancient Enemy. See Friedman,* 912 F.2d at 332 (validating facial-hair restriction in part because Moslem prisoners were allowed to participate in other aspects of their religion); *Harper,* 877 F.2d at 733 (upholding ban on literature promoting sexual contact between adults and juveniles in part because prisoners had access to other literature that did not violate the prison's security policy).

### C. Effect on Guards, Prisoners, and Prison Resources

■ "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262. As discussed above, prison officials reasonably concluded that allowing Stefanow to possess *Christianities Ancient Enemy* in the prison would endanger other prisoners and the prison staff. The book gives Stefanow a doctrinal justification and religious blessing for unbridled rebellious behavior against his keepers and for violence against other prisoners. Mohr's words have the capacity "to promote a mutinous and insubordinate temper" among the inmates. *Masses,* 244 F. at 539 (Hand, J.). These collateral dangers further support the prison's decision to confiscate the book.

### D. Alternatives for Serving the Prison's Interests

■ Finally, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court

may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91, 107 S.Ct. at 2262. Stefanow suggests that the prison can alleviate its security concerns simply by restricting his access to the book, so that the book is only available to him in his cell. This accommodation would not remedy the prison officials' concerns for the safety of prison staff who must work with Stefanow himself. Also, the prison officials explained at trial that Stefanow can speak to the inmates in the seven cells adjoining his own and that, if given the book, he could pass it to other prisoners in violation of prison rules. We note again that every inmate in Stefanow's Special Management Unit has demonstrated a proclivity for violence. Stefanow's proffered accommodation would not necessarily prevent dissemination of the book to other prisoners, and ultimately, would not resolve the prison's concerns for the safety of inmates *and* prison staff. Thus, Stefanow cannot point to an alternative accommodation that does not compromise the prison's valid penological interests.

### CONCLUSION

Because Stefanow is not compelled by his religion to read *Christianities Ancient Enemy*, we hold that confiscation of the book did not impermissibly restrict his free exercise rights under RFRA. Applying the *Turner* factors, we also hold that confiscation of the book was reasonably related to the prison's legitimate penological interests and therefore that the prison did not impermissibly restrict Stefanow's free speech rights. We defer to the prison officials' determination that introduction of this book into the prison would pose a threat of violence to prisoners of other races and to the prison staff. Accordingly, we affirm the judgment of the district court in favor of the defendants. Because we affirm the district court's judgment on the merits, we do not address the question of whether the defendants were entitled to qualified immunity.

**AFFIRMED.**