Herbert N. SAMPLE, individually and on behalf of all persons similarly situated, and Ronald G. Rivera, individually, Plaintiffs,

v.

R.G. BORG, Warden of California State Prison at Folsom and the California State Prison at Sacramento and James Roland, as Director of the California State Department of Corrections, Defendants.

No. CIV. S–85–0208 LKK.

United States District Court, E.D. California.

Dec. 14, 1987.

As Amended Dec. 16, 1987.

Jay B. Petersen, Steven Hirsh, Michael S. Pfeffer, California Indian Legal Services, San Francisco, Cal., for plaintiffs.

John K. Van De Kamp, Atty. Gen. of the State of Cal., Cathy A. Neff, Supervising Deputy Atty. Gen., Sacramento, Cal., for defendants.

OPINION AND ORDER AFTER TRIAL

KARLTON, Chief Judge.

In this case the court is asked to determine whether the Constitution of the United States inhibits the power of the Warden of the California State Prison at Sacramento to determine that certain prisoners may not participate in any outward manifestation of their religious belief. More precisely, the suit relates to the limitations imposed upon adherents of traditional Native American religion incarcerated in the security housing unit of that prison. Plaintiff,[1] whose religious belief is undisputedly sincerely held, seeks first an opportunity to celebrate the pipe ceremony under the guidance of a spiritual leader,[2] and second, the right to possess, make and wear certain artifacts of his religious life, specifically a hairwrap or headband,[3] tobacco ties,[4] and a medicine bag.[5]

That the question of religious freedom in prison is raised in this case by a Native American simply compounds the lamentable character of cases of this nature, since it cannot be gainsaid that the destruction of American Indian culture and religious life was for many years a conscious policy of this nation. *See, e.g., First Annual Report to the Congress of the United States from the National Advisory Council on Indian Education* (March, 1974).[6] Moreover, and independent of the special poignancy derived from the fact that this case is brought by Native Americans, it is a terrible comment upon our society that a serious question exists as to whether the security of a prison is compromised by permitting inmates to engage in legitimate religious practices.

I

FACTS

A Security Housing Unit ("SHU") is a maximum security, minimum privilege, segregated prison housing unit. The SHU at California State Prison, Sacramento County, was opened October 1, 1986. It consists of four blocks, comprised of three sections each. Two sections contain 20 cells, and a third section contains 24 cells. Inmates are double-celled and, accordingly, each block has a capacity of 128 inmates. Staffing for

1. This suit was originally filed both as a class and an individual action. All issues in the class action have been resolved by the parties, and all that remains is plaintiff Ronald G. Rivera's claims arising out of his status as an inmate in the security housing unit.

2. The pipe ceremony is described in detail in *Allen v. Toombs,* 827 F.2d 563, 565 n. 4 (9th Cir.1987).

3. Headbands and hairwraps symbolize the wearer's commitment to practicing a traditional Native American way of life. The identity of cultural and religious practices among Native Americans transforms this apparently essentially cultural affirmation into one of religious significance.

4. Tobacco ties are pinches of tobacco contained in small closed squares of cloth attached to twine. The string may be of varying length and

may contain a few or many containers. They are left in trees, bushes, and sweat lodges as offerings to the spirits, and may be hung about a dwelling for the same purpose.

5. Tobacco pouches or medicine bags are containers usually made of leather, frequently, but not necessarily, made by the practitioner, which contain objects relevant to the owner's spiritual life and experience. Because of the special place tobacco occupies in the Native American religion, the bag will frequently contain a pinch of tobacco.

6. It has been suggested that the statute embodying the explicit Congressional determination to reverse that national policy may be no more than unenforceable precatory language. *See Standing Deer v. Carlson,* 831 F.2d 1525 (9th Cir.1987) (declining to determine whether there is a private right of action under the American Indian Religious Freedom Act, 42 U.S.C. § 1996).

each block consists of two gunmen (one who doubles as a control officer and one who is responsible for supervising the exercise yards), three floor officers (one for each section), and search and escort officers.

The SHU block includes two offices for floor staff, counselors and medical technician assistants. The offices are used for regular office duties, hearings, interviews, and examinations. There is an area in front of the cells which may be described as a "day room." At present, as a general matter, prisoners are not permitted in the day room area except to pass through it escorted by officers for one of the very limited purposes permitting departure from the cell.

Entrance to the cell is made through a solid metal door, which includes a long, narrow glass window running perpendicular to the floor. Because prisoners are fed in their cells, the doors also have a food port running horizontal to the floor, which is wide enough to admit a food tray.

The prisoner regimen in the SHU is extremely rigid. SHU inmates are under strict limitations as to the amount and kinds of personal property which they may possess and keep in their cells. By virtue thereof, Native American prisoners confined to the SHU may not wear or possess medicine bags, tobacco ties, hairwraps or headbands, all of which possess religious significance for practitioners of the Native American religion (*see* footnotes 3 through 5).[7]

At present, the population in the SHU stands at 494 prisoners. Although as a general matter the SHU contains some of the most violent and violence-prone inmates in California's prisons, inmates may also be incarcerated in the SHU in order to safeguard them from other prisoners, and for other institutional reasons.[8]

The average stay in the SHU is approximately nine months, but it is possible for an inmate to remain in the SHU for several years. The present plaintiff has been in the SHU for approximately one year. He is on an indeterminate sentence and, at least theoretically, may remain in the SHU until his parole date in 1990.[9]

As a general matter, SHU inmates may leave their cells only for showers, hearings within and outside the unit, exercise, court appearances, medical and dental examinations or treatment, and non-contact visits. Contact visits apparently can only be had with attorneys.

Although as noted above, most of the prisoners incarcerated in the SHU are violent, the authorities recognize the variation among prisoners for certain purposes. Thus, as an example, the named plaintiff in this case is a "five day floor tender." For that purpose, he is permitted to leave his cell and to remain on the tier to clean it.

SHU inmates may consult and counsel with staff clergy and approved volunteer clergy during cell visits conducted through the cell door. These visits may be accomplished weekly or more often upon request of the inmate. Inmates are never allowed to congregate in groups, with the sole exception of group exercise.[10] SHU inmates may not participate in any religious ceremony. By virtue of this rule, Native American prisoners in the SHU may not participate in either the sweat lodge ceremony or the pipe ceremony available to general population practitioners. This policy has been in effect since the opening of the SHU.

7. Although Native Americans from various tribes and localities have different religious practices, the basic religious posture is syncretic and inclusive. Accordingly, it appears appropriate to write of a Native American religion, or at least of Native American religious practices.

8. Thus the plaintiff in this case is incarcerated in the SHU by virtue of his having been found to be "an associate" of a prison gang, the Mexican Mafia, rather than as the proximate result of some immediate violation of prison rules.

9. The possibility in the instant plaintiff's case is more than merely theoretical. Given that plaintiff is in the SHU by virtue of his status rather than as punishment for a particular act, there is no apparent way for him to work his way out of his SHU incarceration.

10. This exception is apparently the result of a court order requiring that inmates be permitted to exercise and the limited number of available exercise yards.

The plaintiff in this case is a sincere practitioner of his religion, and seeks the right to celebrate various religious rites and possess various religious artifacts, all of which are deeply rooted in the Native American religious experience. Three themes are central to Native American religious life: purification, offering, and vision. The ceremonial manifestations of these three aspects of Native American religious life are of such a character that the deprivation of one (for whatever reason) makes more critical, from a spiritual standpoint, the need to participate in another. Thus, for Native Americans who are unable to participate in a sweat lodge ceremony (a purification rite) by virtue, for instance, of their physical impairment, participation in a pipe ceremony (an offering rite) becomes more important.

## II

## CONSTITUTIONAL RIGHTS OF STATE PRISONERS

One might think that this case is disposed of simply by reading the plain words of the First Amendment to the Constitution of the United States ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof"), which was made applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). Indeed, the Supreme Court has recently acknowledged that "[i]nmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz,* — U.S. —, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987) (citations omitted). Unfortunately, no such simple disposition is permitted. Rather, the Supreme Court has taught that such cases require "accommodation between institutional needs and objectives and the provisions of the constitution that are of general application." *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (quoting *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974)). The Court has taught that while engaging in this mutual accommodation, allowance must be made for "the respect and deference that the United States Constitution allows for the judgment of prison administrators." *O'Lone,* 107 S.Ct. at 2405.[11]

Even conceding a lack of specific textual support for deference to prison authorities, it is true that our Constitution is not only an "embodiment of our most precious values," but "a great document of practical governance." *Potter v. Rain Brook Feed Company, Inc.,* 530 F.Supp. 569, 580 (E.D. Cal.1982). Accordingly, it is hardly surprising that constitutional doctrine recognizes that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Those "limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone,* 107 S.Ct. at 2404.

The tension between notions of retained and retracted prisoner rights must be resolved in some manner. The High Court's resolution requiring deference is premised, in substantial part, upon the assertion that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner v. Safley,* — U.S. —, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987) (quoting *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)).[12] In this

---

**11.** Given the fact that nowhere in the Constitution can one find explicit textual support for such a duty, one must assume that it is derived from "penumbras, formed by emanations" from the text. *See Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965).

**12.** Assuming the observation is relevant, it hardly seems sufficient to justify the kind of deference both explicitly and implicitly required by the cases. Examining the problem from the limited perspective of competence to administer a prison fails to recognize the obverse, which is that prison officials, preoccupied as they must

court's opinion, the doctrine of deference, as it has evolved, does not adequately serve First Amendment values. Nonetheless, whatever this court thinks of the doctrine, whether as a matter of faithfulness to constitutional text or fidelity to constitutional values, I am bound by those decisions. I now turn to an explication of their specific teachings.[13]

The Court has explained that "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 107 S.Ct. at 2261. We are further taught that:

> A number of factors are relevant in determining whether a challenged regulation is reasonable. These include: (1) whether the regulation has a logical connection to the penological interests invoked to justify it; (2) whether the prisoners remain free to participate in other religious activities; (3) whether accommodating the prisoners asserted rights would have adverse effects on the institution; and (4) whether ready alternatives that fully accommodate the prisoners' rights could be implemented at *de minimis* cost to valid penological interests.

*Standing Deer*, 831 F.2d at 1528. In regard to the third factor, the court is to defer to the informed judgment of prison officials, *Turner*, 107 S.Ct. at 2263, while the presence of the fourth factor is evidence that a regulation, rather than being reasonable, constitutes an " 'exaggerated response' to prison concerns." *Id.* at 2262.[14]  *See McCabe v. Arave*, 827 F.2d 634, 638 (9th Cir.1987).

Careful consideration of the factors articulated by the Court suggests that their application strictissimi juris inevitably results in upholding the state's regulation, *see O'Lone v. Shabazz*, 107 S.Ct. 2400 (upholding work assignment policy preventing Muslim inmates from attending weekly religious rites central to faith); *Standing Deer*, 831 F.2d 1525 (upholding restriction on Native Americans wearing headbands). It is apparent, however, that the doctrine has, on some occasions, been tempered by application of notions of equity and common sense. *See, e.g., Turner v. Safley*, 107 S.Ct. 2254 (upholding Missouri ban of correspondence between prisoners, but striking down ban on marriage); *McCabe v. Arave*, 827 F.2d 634 (regulation prohibiting group worship and study by close custody prisoners upheld, but ban of religious literature advocating racial purity where not so inflammatory as to be reasonably likely to cause violence struck down); *McElyea v. Babbitt*, 833 F.2d 196 (9th Cir.1987) (prisoners entitled to religious diet to extent security and budget considerations permit). Part of the problem facing district judges

be with matters such as security concerns, are "ill-equipped" to make judgments about the exercise of constitutional rights. For assuredly, just as a court decree intrudes upon judgments made by prison administrations concerning the area of their responsibility, a failure of the court to act, premised on undue deference, permits the prison authorities to make judgments of a constitutional character.

**13.** While it is true that district courts are bound not gagged, there reaches a point at which I must get on with my job of deciding this case. As I have said elsewhere, "[o]urs is a three level judicial system, reflecting the functions of each court.... [D]istrict courts decide cases, courts of appeal review for legal error, and the ... Supreme Court teaches." *Sierra Club v. Watt*, 608 F.Supp. 305, 332 n. 49 (E.D.Cal.1985). The problem is that everyone wants to do the other guy's job.

**14.** I pause here only long enough to note that such a formulation does not even allow of the possibility of malevolence. I know of nothing in the history of prison administration in this country to provide such utter confidence. Moreover, this formulation does not recognize that extreme deprivations and perceived unfairness may themselves create profound security problems, as the histories of prison rebellions from Attica to the recent incidents involving Haitian detainees clearly demonstrate. It may well be that considerations of this sort are initially for the responsible prison authorities, and that their determinations should be treated with deference. Nonetheless, as has been observed, deference to supposed expertise may be no more than a fiction. *See Bell v. Wolfish*, 441 U.S. at 548, 99 S.Ct. at 1879 ("we further observe that, on occasion, prison administrators may be 'experts' only by Act of Congress or of a state legislature").

is an apparent randomness in result.[15] The doctrinal shakiness and apparent randomness of result leaves this court with an uncertain sense of the appropriate resolution of the instant case. Nonetheless, it is my obligation to decide, and so I now proceed to apply the standards articulated as best I can to each of the claims made by plaintiff.

## III

## RESOLUTION OF THE ISSUES AT TRIAL

### A. *Pipe Ceremony*

█ Plaintiff does not claim a right to participate in either the sweat lodge ceremony or the group pipe ceremony.[16] Rather, plaintiff seeks to participate in a pipe ceremony when visited by a medicine man at his cell door.[17] The plaintiff suggests that the pipe could be passed between the participants through the food port in the door.

The defendant's objection to the pipe ceremony as proposed by plaintiff appears to be two-fold: first, a fear that the pipe could be used as a weapon, and second, a fear of the ripple effect caused by granting Native Americans this opportunity. Although defendants have had difficulty articulating both concerns, the court cannot find that the restrictions are completely irrational. Thus one can imagine that permitting a pipe to be passed through the port would in theory provide the worshipper in the cell with a weapon to employ against his cellmate, at least for the period of time until it was returned to the medicine man. Moreover, permitting the ceremony might well lead to demands by Catholics, for instance, that they be given Communion.[18]

I have suggested above that the relationship between the rule prohibiting a pipe ceremony and common sense is not wholly absent; nonetheless, the question remains as to whether it is *"reasonably* related to legitimate penological interests." *Turner v. Safley*, 107 S.Ct. at 2261 (emphasis added). To determine the answer to that question, I turn to the four-factor test articulated in *Turner*.

First, is there a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"? *Id.* at 2262 (citation omitted). Of course, security and the safety of a cellmate are legitimate governmental interests. Yet upon analysis, the relationship between that interest and the regulation is so remote as to make it difficult to find it "valid." Surely, if a prisoner wishes to attack his cellmate, he can use another homemade weapon[19], or use his bare hands.[20] Moreover, permitting the adherents of other religions to participate in such religious rites as may be conducted at the cell door through the food port does not appear to represent any more significant burden to the staff than does permitting the religious visit in the first instance.

---

**15.** I assume that the fact that both *O'Lone* and *Standing Deer* dealt with minority religions has nothing to do with their outcome. Moreover, it does not appear relevant that *Turner* and *McCabe* dealt with non-religious as well as religious First Amendment rights (*Turner* the right to marry and *McCabe* the right to read).

**16.** By virtue of a stipulation between the parties in this action, such ceremonies will be available to members of the general prison population.

**17.** Plaintiff also suggests alternate places for holding the pipe ceremony. Since each of these places involves permitting plaintiff to leave his cell, each invokes serious security objections. Under the circumstances, the court will restrict its consideration to the most modest of plaintiff's proposals.

**18.** This court must observe that I can hardly believe that anyone would regard this as an untoward result; nevertheless, as noted above, in matters of security and burdens on resources, I am to defer to the judgment of the prison authorities.

**19.** In this trial, the defendants proved the remarkable ingenuity prisoners demonstrate in fabricating weapons out of anything they can lay their hands on.

**20.** Indeed, it is difficult to fully credit this as a justification for the rule adopted by prison officials since it is they who have decided to double-cell inmates in the SHU. While the history of cellmate violence since the opening of the SHU gives no cause for complacency, that violence is the direct result of the decision to double-cell under the conditions of SHU incarceration.

While I cannot say the relationship between the rule and its purported justification is wholly irrational, I find it is so "remote" as to be "arbitrary." *Id.*

Second, I must determine whether there is an "alternative means of exercising the right [which] remain[s] open to prison inmates." *Id.* The exact dimension of this factor is uncertain. As the Court has since explained "[i]n *Turner* we ... examined whether the inmates were deprived of 'all means of expression' ... we think it appropriate to see whether under these regulations respondents retain the ability to participate in other ... religious ceremonies." *O'Lone v. Shabbazz,* 107 S.Ct. at 2406 (citation omitted).

As I noted above, under the regulations plaintiff is deprived of all outward manifestations of his religious commitment. While it is true that he may engage in solitary and inward religious conduct such as prayer and meditation, to hold that the availability of such practices is sufficient to uphold the ban at bar would render the second factor meaningless. Put another way, since the state cannot deprive plaintiff of his ability to pray alone and in silence, it is meaningless to ask whether the state's failure to deprive the plaintiff of that opportunity supports a finding that its deprivation of other religious rites is reasonable.

I have noted above that the state has deprived plaintiff of the sweat lodge ceremony, thus making the spiritual need for participation in the pipe ceremony more urgent. The state argues, however, that an alternative means of purification, namely fasting,[21] demonstrates that there are available alternatives. This court must reject that argument. "Permitting" fasting is not evidence of the reasonableness of the state's rules because, like solitary silent prayer, the plaintiff can engage in fasting without the state's permission. Given the

state's ban on all religious ceremony it can prohibit, I conclude that consideration of the second factor suggests that the state's rule is an exaggerated response to its real security concerns.

The third factor to be considered is "the impact accommodation ... will have on guards and other inmates, and on the allocation of prison resources generally." As noted above, courts must be "particularly deferential" regarding this factor and concerns regarding the "ripple effect." Because the prison already allows visits by clergy, it is difficult to see that permitting the pipe ceremony will have any significant direct impact upon guards, other inmates,[22] or other resources. On the other hand, as I have noted above, it may well be that inmate adherents of other faiths will demand that they be permitted to engage in such religious rites as may be practiced through the food port. Nonetheless, there is no evidence of what burden such demands would have on the resources of the institution. Surely, fundamental constitutional rights cannot be curtailed on the basis of unsubstantiated, and indeed, unfocused fears.[23] Whatever the degree of deference owed prison officials, it must be accorded only "the *informed* discretion of corrections officials." *Turner,* 107 S.Ct. at 2262 (emphasis added).

The final factor to be considered relates to whether alternatives to the rule, in this case a complete ban, exist. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation," while the existence of "an alternative that fully accommodates the prisoner's rights at *de minimus* cost to valid penological interests" may be "evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* As noted above, plaintiff's proposal to permit the

---

**21.** Plaintiff has engaged in fasting several times since his placement in the SHU.

**22.** At trial the court learned that plaintiff's cellmate is also a practitioner of Native American religion; thus fears concerning religious strife between cellmates also appears irrelevant to this suit.

**23.** If the answer to that assertion is "yes, they can," then the assertion that "when a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights," *Turner,* 107 S.Ct. at 2259 (quoting *Procunier v. Martinez,* 416 U.S. at 405–06, 94 S.Ct. at 1807–08 (1974)), is a promise without substance.

pipe ceremony at the door is an alternative to the total ban and from all that appears of record will have a de minimis impact on the prison personnel, other inmates, or the budget of the prison.

For all of the above reasons, it does not appear to this court that the state has struck a constitutionally appropriate balance between the plaintiff's First Amendment rights and prison administrative needs concerning its rule banning celebration of a pipe ceremony at the door of plaintiff's cell.

### B.  *The Drum Ceremony*

Although plaintiff seeks to participate in a drum ceremony conducted at his door, little or no evidence was introduced at trial as to what a drum ceremony is, and what, if any, impact it would have on the prison regime.  Plaintiff of course has the burden of production and persuasion.  Given the record, the court is unable to engage in the detailed analysis required under *Turner.* Under such circumstances, his claim cannot prevail.

### C.  *Possession of Medicine Bags*

■  As noted above, plaintiff seeks the right to possess on his person, or at least in his cell, a medicine bag.  Defendant objects because of fear that the bag may be used to contain the makings of weapons (stones, dried berries, and the like), and for fear that inspections by guards to insure the contents were not contraband could result in violent confrontation.  Defendants also assert fear that disputes concerning such items could lead to violence between cellmates.

I noted above that at trial defendants proved the remarkable ability of prisoners to turn the most innocent of objects into weapons.  While I must confess a suspicion that defendants' response is exaggerated, I cannot say in light of the evidence that such is the case.  Given the deference I am

enjoined to apply, I must find against plaintiff's claim in regard to medicine bags.[24]

### D.  *Tobacco Ties*

■  Other than a generalized and relatively unfocused security claim, the reason for banning possession of tobacco ties appears to relate solely to the rule limiting personal property.  It appears to the court that the absolute ban presently in place must give way to a more limited rule.

I begin by observing that it is undisputed that practitioners of other religious faiths may possess and wear religious medallions while incarcerated in the SHU.[25]  Thus to some degree this issue implicates questions of equal treatment of the religious claims of plaintiff vis-a-vis other more conventional practitioners.  *See Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972).  More to the point, however, application of the four-fold test demonstrates the impropriety of a total ban.  The question of the burden on prison personnel which may be attendant upon requiring that the sacks be opened for inspection may be made de minimis by limiting the number of ties which may be possessed.  In like manner, limiting the tensile strength of the string which may be used minimizes the danger of the tie being used as a weapon.  Finally, requiring that the tie be kept in the inmate's cell minimizes potential for conflict between staff, and the ripple effect as to other prisoners.

Under the circumstances, the court believes that a total ban is an exaggerated response and accordingly will require defendants to provide regulations permitting but regulating the possession of tobacco ties.  While it is true that prison officials do not "bear the burden of disproving the availability of alternatives," *Standing Deer v. Carlson,* 831 F.2d at 1529, the "availability of accommodations is relevant

---

**24.**  Having made my determination under the applicable law, I will urge the prison administrators to further consider the question as to whether some rule regulating content or otherwise short of an absolute ban would not serve their security needs.

**25.**  Although this fact has more relevance to the issue of hair wraps or bands (see section E, *infra* ), the sacramental character of tobacco ties is not in dispute.

to the reasonableness inquiry." *O'Lone,* 107 S.Ct. at 2405.

### E.  *Headbands and Hairwraps*

It is conceded that the wearing of hair in a traditional style has sacramental significance.  Here, as with the issue of tobacco ties, the right of other religious believers to wear religious medallions weighs against the absolute ban presently in place.  As the Court has explained, "[w]e have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." *Turner,* 107 S.Ct. at 2262.  The High Court has not explained the effect of finding non-neutral application, but the Ninth Circuit has observed that although some content based regulation is permitted, its presence requires closer scrutiny of the prison authorities' conduct. *McCabe v. Arave,* 827 F.2d 634, 638 (9th Cir.1987).

  Defendants argue that permitting hair wraps and headbands represents an undue burden on the efficient operation of the prison because all movement of a prisoner will have to be delayed while hairwraps and headbands are undone for the purpose of searching for weapons and contraband.  Given the deference this court is required to accord prison authority in determinations of this character, it appears that plaintiff's claim relative to hair wraps must fail.  Nonetheless, it does not require extended discussion to see that the problem of removing and searching a headband is of such a de minimis character that the total prohibition must yield to plaintiff's rights under the First Amendment.

## IV

### CONCLUSION

The founders had a profound understanding of both the importance of religion in an individual's private life, and its potential for divisiveness in public life.  To that end, the First Amendment protects the former and limits the latter.  Much current litigation symbolizes how far we have strayed from the founders' understanding.

The test of our dedication to constitutional values is not insuring rights for majorities whose practices and symbols as a practical matter do not require legal protection. *But see Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). Rather, dedication to our constitutional system is tested by the cases of minorities. As so much of the current litigation concerning religious practices demonstrates, that dedication is subject to reasonable doubt.  Nonetheless, this court is bound by the decisions of the Supreme Court and the Ninth Circuit and, accordingly, IT IS HEREBY ORDERED:

1. Defendants shall modify their present policy to:

  (a) Permit plaintiff to participate in a pipe ceremony to be celebrated at his cell door by passing the pipe through the food port;

  (b) Permit tobacco ties to be possessed by plaintiff under reasonable regulation;

  (c) Permit plaintiff to wear a headband.

2. In all other respects, plaintiff's claims relating to restriction on religious practices while incarcerated in the SHU are DENIED.

IT IS SO ORDERED.