Seace v. NH DOC et al.               CV-99-296-B    10/22/01

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Russell C. Seace, Jr.**

  v.           Civil No. 99-296-B
               Opinion No. 2001DNH196

**New Hampshire Department**
**of Corrections, et al.**


## MEMORANDUM AND ORDER


Russell C. Seace, Jr. has brought this action against the New Hampshire Department of Corrections and various prison officials[1] pursuant to 42 U.S.C. § 1983, seeking damages and injunctive relief for alleged violations of his First and Fourteenth Amendment rights that occurred during his incarceration at the prison's Lakes Region facility. Seace claims that by enforcing a prison regulation that prohibits prisoners from possessing certain written materials, the

---

[1] The defendants are the New Hampshire Department of Corrections; John L. Sanfilippo, Warden of the Lakes Region Facility; Robert M. Clough, a unit manager; Lieutenant Steven A. Commeau, a corrections officer; Sergeant Marilyn Whitten, a corrections officer; Wayne Brock, chairperson of the Literary Review Committee; and certain unidentified members of the prison's Special Emergency Response Team (SERT).

defendants interfered with both his right to freely exercise his religion and his right to free speech. He challenges the constitutionality of this prison regulation both on its face and as it was applied to him. Furthermore, Seace claims that the defendants violated his Fourteenth Amendment right to equal protection of the law when they discriminated against him because of his religious views and membership in the Church of Jesus Christ Christian (CJCC).[2]

The defendants have moved for summary judgment. For the following reasons, I grant their motion.

## FACTS[3]

### A. Policy and Procedure Directive 5.26

The New Hampshire Department of Corrections maintains and

---

[2] On May 10, 2000, I approved Magistrate Judge Muirhead's Report and Recommendation, Doc. No. 11, which dismissed several of Seace's claims including: (1) his claim pursuant to the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb; (2) his claim that his First Amendment rights were violated when the defendants confiscated his swastika necklace and a graduation plaque; and (3) his claim that his Fourteenth Amendment due process rights were violated when the defendants reviewed his mail and literature.

[3] I construe the evidence in the light most favorable to Seace, the non-moving party. See Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).

enforces a policy regarding inmate mail, which, among other things, establishes a procedure for mail security screening whereby all incoming and outgoing mail is subject to being opened and read. This policy, known as Policy and Procedure Directive 5.26 (PPD 5.26), provides that inmate incoming and outgoing mail that meets certain criteria will be forwarded to the prison's Investigations Unit for review. Among the materials forwarded to the Investigations Unit are those that contain "[d]escriptions or depictions that encourage activities which may lead to the use of physical violence or group disruption"; "[m]aterials that encourage or instruct in the commission of criminal activities or violation of rules of conduct for prisoners"; and "[c]ontents that would, if transmitted, create a clear and present danger of violence and physical harm to persons or property, or severe psychiatric or emotional disturbance to a resident." PPD 5.26 §§ IV(B)(2)(h),(i),(m). If mail falls into any of the above categories, the Investigations Unit forwards it to the Literary Review Committee (LRC).

The LRC reviews mail, and any other confiscated literary material forwarded to it, in order to determine whether PPD 5.26 prohibits its possession by inmates. The LRC is composed of

three members, including chairperson Wayne Brock. The members review each piece of mail or confiscated literature independently and then vote on whether to allow the inmate to receive the material. If a majority of the LRC decides that the materials violate PPD 5.26, the LRC gives the inmate a written notice explaining why his mail, or other confiscated literature, has been rejected. The actual item is then returned to the mail room with a rejection notice. An inmate has ten days to appeal an LRC decision to the Warden or Superintendent. If an LRC decision is affirmed on appeal, or if the inmate does not appeal, the inmate has ten days to return the materials to the sender. Otherwise, the materials are discarded.

PPD 5.26 prohibits the LRC from creating blanket restrictions on a particular type of mail. For example, the directive states, "[t]here shall not be an excluded list of publications: each issue of a subscription is to be reviewed separately." PPD 5.26 § IV (C)(6). It further directs that if material violates no section of the policy, it "may not be rejected solely because its content is religious, philosophical, political, social, sexual, unpopular or repugnant." Thus, the LRC does not have unfettered discretion to approve or withhold

inmate mail and literature.

## B. **Plaintiff's Claims**

Seace is currently serving a three-and-a-half to seven year sentence for burglary. From August 11, 1998 to October 15, 1999, Seace served a portion of his sentence in the prison's Lakes Region facility. He is currently a member of the Church of Jesus Christ Christian, a white-supremacist church closely affiliated with the Aryan Nations.[4] Seace believes Caucasians are superior to all other races, and believes in "peaceful" racism and segregation. At one point, Seace also was a member of the World Church of the Creator.

### 1. **Facts Relevant to Free Exercise and Free Speech Claims**

While incarcerated at the Lakes Region Facility, Seace either possessed or received in the mail various materials that were potentially prohibited by PPD 5.26, and therefore warranted review by the LRC. On February 6, 1999, SERT officers conducted a general security search of Seace's dormitory unit to uncover

---

[4] For information pertaining to the CJCC's history and teachings, as well as a description of some of its literature, see Nichols v. Nix, 810 F. Supp. 1448, 1451-53 (S.D. Iowa 1993), aff'd, 16 F.3d 1288 (8th Cir. 1994). See also Stefanow v. McFadden, 103 F.3d 1466, 1469-71 (9th Cir. 1996) (describing contents of book, Christianities Ancient Enemy, authored by CJCC pastor, Gordon "Jack" Mohr).

contraband. Twenty-four inmates lived in the unit and each had a footlocker in which to keep personal belongings. When they searched Seace's footlocker, the officers confiscated white-supremacist literature that they believed might violate PPD 5.26 and gave it to Sergeant Whitten, a corrections officer. The materials consisted of several issues of "Calling Our Nation," published by the Aryan Nations; several issues of a periodical called "The Struggle," published by the World Church of the Creator; a copy of the Klansman's Handbook; a book entitled Your Heritage; and a few pieces of personal correspondence, including a letter from the prison ministry director at the CJCC.

After the search of Seace's dormitory unit, Seace met with Lieutenant Commeau to discuss the confiscated literature. Commeau told Seace that the materials could incite violence among the inmates. During the meeting, Whitten entered the office and presented Commeau with Seace's literature. Commeau and Clough, the unit manager, decided, and Seace consented, to send the materials to the LRC.

The LRC individually reviewed each of the seized items and decided not to return them to Seace, concluding that they violated PPD 5.26. With respect to each item, the LRC concluded

that it posed a risk to the maintenance of good order and security at the prison either because: (1) it was material which encourages activities which may lead to the use of physical violence or group disruption; or (2) it was material which encourages or instructs in the commission of criminal activities or rules of conduct for prisoners; or (3) it was material which if transmitted, creates a clear and present danger of violence and physical harm to persons, property or serious psychiatric or emotional disturbance to a resident.

The LRC later determined that other materials, including a copy of The White Man's Bible and an October 1999 issue of "The Struggle" which had been mailed to Seace from outside the prison, also violated PPD 5.26. Before making this determination, the LRC reviewed each questioned item individually and determined that it violated one or more of the criteria identified in PPD 5.26.

## 2. Facts Relevant to Equal Protection Claim

On February 6, 1999, after the general search of the dormitory unit in which Seace lived, the inmates were taken to the gymnasium where they were all strip-searched. After noticing that Seace wore a swastika necklace, one of the SERT officers

began questioning him in a harassing manner concerning his religious beliefs. The officer took Seace's necklace and placed him in a holding cell until he could talk with Commeau.

Seace asserts that Commeau repeatedly harassed him by labeling him a member of the "Aryan Brotherhood," and by denying him a copy of the prison's Policy and Procedure Directive regarding discrimination. Seace also claims that Clough, the unit manager, failed to act when he was notified of Commeau's discriminatory treatment of Seace. Seace also alleges that Whitten made him "feel like I was being attacked because of my religious beliefs" because Whitten voiced her opinion, telling him that she didn't approve of white-supremacy. Furthermore, he claims that she violated his religious beliefs at one point by housing him in a dorm with African-American inmates. Finally, Seace asserts that the refusal of the prison to use his design for his unit's plaque is further proof of discrimination.

## STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is one "that properly can be resolved only by a finder of fact because [it] ... may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A material fact is one that affects the outcome of the suit. See id. at 248.

In ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-movant. See Oliver, 846 F.2d at 105. The party moving for summary judgment, however, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] ... which it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb

Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex, 477 U.S. at 323). I apply this standard in resolving the defendants' motion for summary judgment.

## DISCUSSION

As noted, Seace claims that the defendants violated both his right to free speech and his right to freely exercise his religious views[5] when they denied him access to his white-supremacist literature. In addition, Seace claims that the defendants denied him his Fourteenth Amendment right to equal protection of the laws when they discriminated against him because of his religious beliefs. The defendants move for summary judgment as to all claims. I address each claim below.

### A. First Amendment Claims

The Supreme Court has developed a standard by which to judge a prisoner's claim that the enforcement of a prison policy violates a fundamental constitutional right. The Court

---

[5] Whether the CJCC is a religion has been a subject of debate. See, e.g., Nichols, 810 F. Supp. at 1451 n.7 (citing Murphy v. Missouri Dep't of Corrections, 814 F.2d 1252, 1255-56 (8th Cir. 1987); McCabe v. Arave, 827 F.2d 634, 637 n.2 (9th Cir. 1987); Wiggins v. Sargent, 753 F.2d 663, 666-67 (8th Cir. 1985)). Here, for purposes of ruling on defendants' summary judgment motion, I assume that the CJCC is a religion.

recognizes that prisoners do not surrender all constitutional rights upon incarceration, and has stated that "federal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84 (1987). The Court has also emphasized, however, "the increasingly urgent problems of prison administration and reform." Id. (internal quotation marks and citation omitted). To reconcile these competing concerns, the Court has decided that when a prison regulation that burdens a fundamental right is called into question, the proper inquiry is whether that regulation "is reasonably related to legitimate penological objectives, or whether it represents an exaggerated response to those concerns." Id. at 87 (internal quotation marks omitted).

The Court explained that four factors are relevant to determining the reasonableness of a prison regulation. First, the court considers whether a valid and rational connection exists between the prison regulation and a legitimate governmental interest. Id. at 89. Second, the court considers whether alternative means of exercising the burdened right remain open to the affected inmates. Id. at 90. Third, the court considers how accommodation of the constitutional right would

-11-

impact prison guards and other inmates, and whether it would affect the general allocation of prison resources.  Id.  Finally, the Court explained that the absence of ready alternatives supports the conclusion that the regulation is reasonable, whereas the existence of obvious, easy alternatives could suggest that the regulation is not reasonable, and instead an exaggerated response to prison concerns.  Id.

The Supreme Court and several circuit courts have squarely addressed prison regulations nearly identical to PPD 5.26, applied the Turner analysis, and held that they are reasonably related to legitimate penological objectives.  See generally Thornburgh v. Abbott, 490 U.S. 401 (1989); Chriceol v. Phillips, 169 F.3d 313 (5th Cir. 1999); Stefanow v. McFadden, 103 F.3d 1466 (9th Cir. 1996).  In Thornburgh, the Court reviewed Federal Bureau of Prisons regulations that authorized wardens to reject incoming publications that were determined to be detrimental to the institution's security or that might promote criminal activity.  490 U.S. at 404.  The regulations expressly prohibited prison officials from rejecting publications based solely upon their religious, philosophical, political, social or sexual content, and from establishing an excluded list of publications,

-12-

instead requiring that each issue of a subscription be reviewed separately. Id. at 405. The Court concluded that the regulations were reasonably related to security interests, explaining that certain publications can lead directly to violence in prisons, or could exacerbate tensions and lead indirectly to disorder. Id. at 416. The Court stressed that the individualized review of publications was an important factor in reaching its conclusion, explaining that this portion of the regulations distinguished them from unconstitutional censorship. Id. at 415-16 & n.14; cf. Williams v. Brimeyer, 116 F.3d 351, 353-54 (8th Cir. 1997) (holding blanket ban on CJCC materials unconstitutional). Finally, the Court considered the regulations in light of each of the four factors set forth in Turner, and determined that the regulations were consistent with each factor. See Thornburgh, 490 U.S. at 417-18.

PPD 5.26 is indistinguishable from the regulations considered in Thornburgh. PPD 5.26 requires that each piece of literature or mail be considered individually before a prisoner is denied access to it. The stated purpose of PPD 5.26 is to prevent violence and the commission of criminal activity. Furthermore, PPD 5.26 explicitly states that if material violates

-13-

no section of the policy, it "may not be rejected solely because its content is religious, philosophical, political, social, sexual, unpopular or repugnant." This policy directive on its face is reasonably related to the legitimate penological interests of the New Hampshire Department of Corrections. Therefore, PPD 5.26 does not on its face violate Seace's free speech and free exercise rights.

I also reject Seace's claim that the defendants unconstitutionally applied PPD 5.26 to categorically ban CJCC material. Defendants deny that they imposed a categorical ban on all racist materials and Seace has produced no admissible evidence to support his bald assertion to the contrary.

Finally, Seace has failed to produce any specific letter or publication which he claims the prison improperly excluded under PPD 5.26. As a result, I am in no position to second-guess the LRC's application of PPD 5.26 to any specific letter or publication. Accordingly, Seace has failed to demonstrate that he has a viable free speech or free exercise claim.

## B. **Equal Protection Claim**

Seace alleges that Commeau, Clough, Whitten, and an unnamed SERT officer discriminated against him because of his religious

beliefs. To prevail on his claim, Seace must show that he was treated differently from similarly situated inmates because of his religious views. See Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995).

Seace claims that a SERT officer noticed his swastika necklace, began to ask him harassing questions about his religious views, then took his necklace and placed him in a holding cell. Second, he alleges that Commeau harassed him by calling him a member of the "Aryan Brotherhood" and a "gang member," and by denying him a copy of the prison policy and procedures regarding discrimination, even though he could pay for the associated photo-copying costs. Third, Seace claims that Clough, the unit manager, failed to act when he was notified of Commeau's discriminatory treatment of Seace. Finally, he complains that Whitten made him feel "attacked" because she voiced her disapproval of his white-supremacist views.

These assertions fail to establish an Equal Protection violation. First, isolated instances of name-calling and verbal harassment, by themselves, will not support an equal protection claim. See DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 1999). Thus, even if prison officials called Seace a member of the Aryan

Brotherhood and a gang member and told him that they disagreed with his religious views, their verbal statements would not amount to an equal protection violation.  Second, Seace neither alleges in his complaint, nor offers evidence to suggest, that defendants treated him differently from other similarly situated inmates when they briefly placed him in a holding cell, denied him access to the prison's discrimination policy, and housed him with inmates of different races.  Accordingly, I grant the defendants' motion for summary judgment as to Seace's equal protection claims.

## CONCLUSION

For the foregoing reasons, I grant the defendants' motion for summary judgment (Doc. No. 24).  The Clerk is directed to close the case.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

October 22, 2001

cc:  Russell C. Seace, Jr., pro se
     Andrew B. Livernois, Esq.

-16-